UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES, | : | Case No. 4:06 cr 0490 |
| | : | |
| Plaintiff, | : | JUDGE KATHLEEN O'MALLEY |
| | : | |
| v. | : | |
| | : | |
| KARL E. WRIGHT, SR. | : | **ORDER** |
| | : | |
| Defendant. | : | |

Before the Court is defendant Karl E. Wright's ("Wright") *Motion to Suppress* (Doc. 29), in which he asks this Court to suppress physical evidence discovered during a search of 824 Lexington Ave., Youngstown, Ohio, and certain statements made by Wright after his arrest. The United States (the "government") filed a response in opposition to Wright's motion to suppress (Doc. 31), and the Court held a hearing on the matter. After the hearing, both parties provided the Court with supplemental briefs. (See Docs. 43, 44) The issue, having been fully heard and briefed, is ripe for the Court's consideration. For the reasons discussed in greater detail below, Wright's Motion to Suppress (Doc. 29) is **DENIED.**

I.   **BACKGROUND**.

Defendant Karl E. Wright is on parole in the State of Ohio. During the period at issue, he resided at 824 Lexington Avenue, Youngstown, Ohio ("824 Lexington"). James Campana ("Campana"), the parole officer assigned to Wright's case, testified that he conducted his "home visits" with Wright at 824 Lexington. The series of events leading to the search of Wright's residence began with a telephone call to Campana.

At the suppression hearing, Campana testified that, on Monday, July 17, 2006, he received a telephone call from Britney Watson ("Watson"). During that telephone call, Watson told Campana that on July 15, 2006 she had a physical altercation with Wright at 824 Lexington, and that Wright shot at her with a sawed-off shotgun as she fled from the house. According to Campana, Watson also told him that she went to St. Elizabeth's Hospital for treatment on July 15, 2006. During the hearing, Campana explained that he instructed Watson over the telephone to file a police report with the Youngstown Police Department immediately. In response to the information she provided, Campana testified that he contacted the United States Marshal's Service Fugitive Task Force (the "Task Force") to accompany him and other officers to 824 Lexington. Campana and the other law enforcement officers proceeded to 824 Lexington on July 17, 2006, the same day that Campana received the tip. Campana did not wait to confirm whether Watson filed a police report.

Upon arrival at 824 Lexington, law enforcement officers immediately detained Wright and conducted a search of the premises. During the search, officers found a sawed-off shotgun under a bed in an upstairs bedroom. Wright was arrested as a result of the discovery of the firearm. According the Campana, after he was advised of his Miranda rights, Wright told the officers that he was the only person who had access to the bedroom where the firearm was found.

After the search of Wright's residence, but while Campana was still on the scene at 824 Lexington, Officer Dave Wilson of the Youngstown Police Department arrived and informed Campana that Watson did file a police report earlier that day, as Campana had instructed. Watson's description of the July 15, 2006 incident in her police report matches the account of the events she gave during her call to Campana, but with slightly greater detail. In her police report, for instance, Watson mentions that she jumped through a window naked to escape from Wright's house, that she sought treatment for

2

some injuries she suffered as a result of her encounter with Wright, and that she was picked up by a Youngstown Police cruiser on the way to St. Elizabeth's Hospital.[1] According to Campana, Officer Wilson also corroborated Watson's claim that she had been picked up by a Youngstown Police cruiser on July 15, 2006.

## II.     LEGAL STANDARD.

Ordinarily, the search of Wright's residence would require a showing of probable cause. "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." United States v. Frazier, 423 F.3d 526, 532 (6th Cir. 2005). The Supreme Court, however, has found that the unique circumstances of probation create, "special needs, beyond the normal need for law enforcement." Griffin v. Wisconsin, 483 U.S. 868, 873 (1987). Those special needs, "permit[] a degree of impingement upon privacy that would not be constitutional if applied to the public at large." Id. at 875. Thus, "pursuant to a reasonable regulatory or administrative scheme authorizing such action, [] the police c[an] search a probationer's residence without a warrant, if they ha[ve] reasonable cause to believe that a violation of a probation condition [i]s taking place." United States v. Carnes, 309 F.3d 950, 960 (6th Cir. 2002).

The State of Ohio's administrative scheme requires, as a standard condition of parole, that a parolee submit to a search upon "reasonable grounds." Under Ohio Revised Code § 2967.131:

> During the period of a conditional pardon or parole . . . authorized field officers . . . may search, *with or without a warrant*, the person of the individual or felon, *the place of*

---

[1] It is unclear why Watson did not immediately file a report. Campana suggested that Watson may not have been in a suitable mental or physical state to give a report at that time.

3

> *residence of the individual or felon . . . if the field officers have reasonable grounds to believe* that the individual or felon has left the state, is not abiding by the law, or otherwise is not complying with the terms and conditions of the individual's or felon's conditional pardon . . . .

Ohio Rev. Code § 2967.131 (emphases added). In Ohio, therefore, the standard for searching a parolee's residence is changed from probable cause to reasonable suspicion[2] and permits, under certain circumstances, a warrantless search. Id. see also United States v. Knights, 534 U.S. 112, 122 (2001) ("When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." And "[t]he same circumstances that lead us to conclude that reasonable suspicion is constitutionally sufficient also render a warrant requirement unnecessary.").

Reasonable suspicion "is based on the totality of the circumstances and has been defined as requiring articulable reasons and a particularized and objective basis for suspecting the particular person ... of criminal activity." United States v. Henry, 429 F.3d 603, 609-10 (6th Cir. 2005). Reasonable suspicion requires "more than an ill-defined hunch." United States v. Richardson, 385 F.3d 625, 630 (6th Cir. 2004). It must be based on "a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). A court

---

[2] The parties do not dispute that Ohio's administrative scheme authorizing such searches of parolees is reasonable. See United States v. Loney, 331 F.3d 516, 521 (6th Cir. 2003) ("we agree, that Ohio's 'reasonable grounds' standard mirrors the reasonable grounds standard first discussed in Griffin, and later characterized as the federal reasonable suspicion standard by this Court in Payne. Accordingly, O.R.C. § 2967.131(C) passes constitutional muster . . . .").

must consider the totality of the circumstances when determining whether an officer had reasonable suspicion of criminal activity.  Id.; United States v. Knox, 839 F.2d 285, 289 (6th Cir. 1988), *cert. denied*, 490 U.S. 1019 (1989).  The evidence offered in support of reasonable suspicion is viewed using a common sense approach.  Richardson, 385 F.3d at 630 (citations omitted).  "Courts analyzing searches under the reasonable suspicion standard use the same factors but require a less demanding showing than when applying a probable cause standard."  United States v. Payne, 181 F.3d 781, 790 (6th Cir. 1999).

**III.    DISCUSSION.**

In his motion to suppress, Wright argues that Officer Campana did not have reasonable suspicion to conduct the search of 824 Lexington.  In sum, Wright contends that Britney Watson's telephone call to Campana was akin to an anonymous tip and that the Supreme Court's holding in Florida v. J.L., 529 U.S. 266 (2000), precludes a finding of reasonable suspicion on the basis of such a tip in the absence of significant corroboration.  In response, the government argues that the search was proper because the tip came from a known individual who had first-hand knowledge of the information. There are no contested facts relevant to the question of whether Watson's telephone call, and other attendant factors, gave rise to reasonable suspicion.[3]  Rather, the parties' dispute is only over whether, given the uncontested facts at issue, Campana had reasonable suspicion that Wright was engaged in criminal activity.  The Court finds this to be a particularly close case, but ultimately agrees with the

---

[3]   Wright does dispute whether Watson was actually treated at St. Elizabeth's Hospital and has asked this Court to compel production of Watson's medical records to help resolve that question.  Because the Court finds that the question of whether Watson received medical care on July 15, 2006 is irrelevant to the suppression issue it now addresses, the Court denied Wright's motion and declines to resolve this one, actual dispute.

5

government's assertion that Campana's search of Wright's residence was proper.

### A. Watson Was Not An Anonymous Informant.

The issue presented turns, in part, upon how the Court defines anonymity with respect to informants. Under a superficial analysis, it would be facile to conclude that Watson's tip was not at all anonymous because she provided Campana with her name. As the Second Circuit recently noted, however, the inquiry into anonymity does not always produce such bright-line results. In United States v. Elmore, 482 F.3d 172, 181 (2d Cir. 2007), the court observed:

> Under the totality of the circumstances approach to assessing probable cause and reasonable suspicion mandated by Gates and White, informants do not all fall into neat categories of known or anonymous. Instead, it is useful to think of known reliability and corroboration as a sliding scale. Where the informant is known from past practice to be reliable, as in Williams, no corroboration will be required to support reasonable suspicion. Where the informant is completely anonymous, as in White, a significant amount of corroboration will be required. However, when the informant is only partially known (*i.e.*, her identity and reliability are not verified, but neither is she completely anonymous), a lesser degree of corroboration may be sufficient to establish reasonable suspicion.

Id. (discussing Alabama v. White, 496 U.S. 325 (1990); Illinois v. Gates, 462 U.S. 213 (1983); Adams v. Williams, 407 U.S. 143 (1972)). Thus, prior to determining the level of corroboration required to assess reasonable suspicion under the totality of the circumstances, the Court must more thoroughly inquire into the identity of Watson – *i.e.*, whether she was known, or partially or completely anonymous.

Wright argues that, from Campana's perspective, Watson was anonymous because he had never spoken to her before and did not take steps to verify her identity. The government argues that Watson was not anonymous because she divulged her name. As the Sixth Circuit has noted: "Traditionally recognized indicia of informant reliability include: 'a detailed description of what the informant

6

observed first-hand, *or the willingness of the informant to reveal his or her name.*'" United States v. Lord, Slip op., 2007 WL 1174402 *4 (6th Cir. Apr. 20, 2007) (emphasis added) (citing United States v. McCraven, 401 F.3d 693, 697 (6th Cir.2005)). Here, Watson provided her name and a detailed description of what she (as the alleged victim) observed first-hand.

While it is conceivable that an informant could fabricate her name as easily as she could fabricate information relating to the alleged illegal activity – the latter being a concern raised by the Supreme Court in J.L. – the circumstances of this particular tip were such as to give Campana little reason to question whether Watson fabricated her identity in an effort to implicate Wright. Though contact over the telephone provides less of an opportunity to assess an informant's demeanor than face-to-face contact, it is noteworthy that Campana spoke to Watson himself. Having personally spoken to Watson, Campana likely could make some basic determinations about her demeanor (*i.e.*, whether she was intoxicated, excited, or flippant) and had the opportunity to question her further if he felt it necessary to do so. United States v. Monteiro, 447 F.3d 39, 45 (1st Cir. 2006) ("the police or a 911 operator often can make some rough judgments about the age, cognitive ability, and motivations of an anonymous informant based on her tone of voice (if the tip occurs via the telephone)"). Watson, moreover, neither questioned Campana regarding the possibility of a reward for providing information regarding Wright, nor sought help from Campana in obtaining leniency in connection with any illegal conduct of her own. Finally, Watson also provided information that would assist Campana in identifying her if the tip turned out to be false. First, of course, Campana knew her name and voice. Her willingness to reveal this information is important when assessing reliability. Lord, Slip op., 2007 WL 1174402 at *4. Watson also explained that she was in a relationship with Wright and that she recently visited a hospital near Wright's home in connection with the alleged assault. J.L., 529 U.S.

7

at 276 (Kennedy, J., concurring) ("If an informant places his anonymity at risk, a court can consider this factor in weighing the reliability of the tip."); see also United States v. Brown, --- F.3d ----, 2007 WL 2110800, at *5 (10th Cir. 2007) ("An unnamed individual who divulges enough distinguishing characteristics to limit his possible identity to only a handful of people may be nameless, but he is capable of being identified and thus is not anonymous."). Considering all these facts, the Court finds Watson to be a substantially-identified informant.

Having concluded that Watson is an identified informant renders much of the jurisprudence relating to anonymous informants and tips largely inapposite. As discussed below, however, the verifiable identity of an informant, though important, does not conclusively establish the reliability of the tip.[4]

### B. Watson's Tip Contained Additional Indicia of Reliability.

Notably, the Supreme Court has not completely foreclosed the possibility that an anonymous tip, standing alone, could provide reasonable suspicion for a Terry stop. The Supreme Court has found that, "anonymous tip[s] alone seldom demonstrate[] the informant's basis of knowledge or veracity inasmuch as ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations . . . . [but] [t]his is not to say that an anonymous caller could never provide the reasonable suspicion necessary for a Terry stop." White, 496 U.S. 325 (citations and internal quotations omitted); see also Frazier, 423 F.3d at 532 ("While independent corroboration of a confidential informant's story is not a *sine qua non* to a finding of probable cause, . . . *in the absence of any indicia*

---

[4]   Indeed, the Court can envision a number of situations where an informant may be conclusively identified, yet other factors would counsel against relying on the tip (if, for instance: the informant was motivated by an ulterior purpose, or the information was stale or second-hand).

of the informant's reliability, courts insist that the affidavit contain substantial independent police corroboration.") (emphasis added). The proper inquiry for the Court, accordingly, is whether a tip contains sufficient "indicia of reliability" to justify reliance thereon. While a tipster's degree of anonymity is an important aspect of reliability, it is not the only thing a Court must consider.

Indeed, the Third Circuit, after conducting a review of Supreme Court cases, listed five aspects of tips that aid in an assessment of their reliability: (1) whether the tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer had an opportunity to appraise the witness's credibility through observation; (2) whether the person providing the tip can be held responsible if her allegations turn out to be fabricated; (3) whether the content of the tip is not information that would be available to any observer; (4) whether the person providing the information has recently witnessed the alleged criminal activity; and (5) whether the tip predicts what will follow, or reflects particularized knowledge. United States v. Brown, 448 F.3d 239, 249-50 (3d Cir. 2006); see also Illinois v. Gates, 462 U.S. 213, 230 (1983) ("[A]n informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report. We do not agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case . . . ."). The first two factors, discussed above in the context of anonymity, weigh heavily in favor of finding Watson's tip to have been reliable. As mentioned above, with respect to the first factor, Campana would have been able to, in part, appraise Watson's credibility and demeanor because he had direct contact with her over the telephone. As for the second factor, the information provided by Watson would permit authorities to hold her responsible if the allegations turned out to have been fabricated.

Though the tip did not provide predictive information, there is more to this fifth factor. In

White, the police "corroborated" aspects of the anonymous tipster's story by observing future events predicted by the tipster (that the defendant would drive a certain vehicle to a certain place at a certain time). White, 496 U.S. at 331. What the Supreme Court found important in White "was the caller's ability to predict respondent's future behavior, *because it demonstrated inside information-a special familiarity with respondent's affairs*. . . . [I]t is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities." Id. at 332 (emphasis added). Thus, according to White, what is critical for assessing the veracity of a tip is not necessarily a prediction of future behavior, but a demonstration that the informant possesses inside information. Indeed, this aspect of the fifth factor largely overlaps with the third, because they both turn on the non-public nature of the tipster's knowledge.

Here, Watson possessed information that would not have been readily available to public. She not only knew Wright's name and address, she knew of his criminal background, knew that he was on parole, and knew his parole officer's contact information. This caused her to contact Campana directly, rather than simply place a cold call to the police.

And, with respect to factor four, Watson claimed that she was the victim[5] of Wright's assault with the shotgun. Thus, as noted above, she had first-hand knowledge of, and witnessed, the facts of the crime she was reporting (Wright's possession of the firearm).[6]

After assessing the nature of the information Watson provided and the manner it which it was

---

[5] First-hand knowledge is a factor to be considered in assessing the reliability of a tip, particularly where a victim is reporting a crime. United States v. Gorin, 564 F.2d 159, 161 (4th Cir.1977) (per curiam) ("[S]tandards of reliability should not prevent appropriate action when a victim of a crime immediately has contacted the police.")).

[6] The tips in White and J.L. were completely anonymous and, importantly, provided *nothing* tending to show *either* reliability *or* basis of knowledge.

10

relayed to Campana, the Court finds that Watson's tip would have possessed the requisite indicia of reliability to justify Campana's decision to take action in response to it.[7]

In his Motion to Suppress, Wright relies heavily on Payne and J.L. where the Sixth Circuit and Supreme Court, respectively, found that there was no basis for reasonable suspicion for the searches conducted by law enforcement because they were entirely based upon an anonymous informant's insufficiently reliable tips. The Court, however, finds J.L. to be readily distinguishable; Payne, too, despite certain superficial similarities, is easily distinguishable from the case at bar.

In J.L.,"All the police had to go on . . . was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." Florida v. J.L., 529 U.S. 266, 271 (2000). Simply stated, few of the circumstances described by the Supreme Court in J.L. are present here. As discussed above, Watson was neither unidentified nor unaccountable. Campana, unlike the officers in J.L., also had a first-hand, detailed report from the claimed victim of a violent crime, who explained exactly how she knew about the gun. In J.L., moreover, the unidentified tipster described the defendant as a "young black male standing at a particular bus stop and wearing a plaid shirt." Id. at 268. Here, Watson identified Wright by name, gave his residential address, and referenced his criminal history and parole status, all implying

---

[7] The government contends that Watson's police report, and subsequent verification by the Youngstown Police of certain aspects thereof, more than provide the reasonable suspicion necessary to justify the search of Wright's home. The government would be correct, but for one *critical* fact – Campana did not know about these facts until after the search had been completed. Though it may be tempting to do so, neither the government, nor this Court can rely upon subsequently obtained information when assessing the constitutionality of the search at issue here. J.L., 529 U.S. at 271 ("The reasonableness of official suspicion, [however,] must be measured by what the officers knew before they conducted their search.").

a level of personal knowledge simply not present in J.L.

Though the Sixth Circuit's decision in Payne addresses the search of a parolee based, in part, upon an informant's tip, there are critical differences between the facts of Payne and those at issue here. See Payne, 181 F.3d at 788-90. At the outset, of course, the tip in this matter was neither vague nor anonymous like the tip in Payne. In Payne, moreover, the Sixth Circuit faulted law enforcement officers for acting on a drug-related tip that was six weeks old, calling the tip "stale" and noting that drugs, "are not the types of objects that are likely to be kept." Id. Here, the tip was not stale, nor does the Court believe that a sawed-off shotgun is as readily disposable as drugs. Finally, in Payne, the Sixth Circuit noted (and reiterated) a significant discrepancy between the search and the tip: the tip related to contraband that purportedly could be discovered in Payne's car, but officers conducted a search of his truck and trailer. Id. Again, there is no disparity between the tip and the search here. Watson's tip stated that Wright kept a shotgun in his house. In short, because the tip came from an identified person (increasing the risk that she may be held accountable if her information proves false), with personal knowledge of the facts (dispelling many hearsay and accuracy concerns), with inside knowledge of the defendant, it carries *substantial* weight.

### C. The Totality of the Circumstances

Finally, Campana, as Wright's parole officer, knew that Wright had a criminal history involving the use of a firearm in a crime of violence. As this Court has previously recognized, a criminal record alone (*i.e.*, in the absence of other articulable facts), does not establish reasonable suspicion. It is, however, one factor of several that may contribute to such a finding. United States v. Rice, 483 F.3d 1079, 1085 (10th Cir. 2007); United States v. Monteiro, 447 F.3d 39, 47 (1st Cir. 2006) ("Criminal history certainly can be considered in a reasonable suspicion analysis."); Payne, 181 F.3d at 790-91 ("a

12

person's criminal record *alone* does not justify a search of his or her home, and the tip in this case adds so little that it does not reach the level of reasonable suspicion.") (emphasis added); United States v. Feliciano, 45 F.3d 1070, 1074 (7th Cir. 1995) ("Knowledge of gang association and recent relevant criminal conduct, while of doubtful *evidentiary* value in view of the strictures against proving guilt by association or by a predisposition based on past criminal acts, is a permissible component of the articulable suspicion required for a Terry stop.") (emphasis in original).  Here, it is also noteworthy that the alleged criminal activity complained of by Watson was similar to the illegal activity found in Wright's criminal record.  Though the Court does not place undue weight upon Wright's criminal history, it is a factor to be considered – a factor absent from the Supreme Court's consideration in J.L.  In sum, the Court finds, when considering the detailed tip from an eye-witness who purported to be the victim of a violent crime involving the use of a firearm in conjunction with Wright's previous criminal history involving similar crimes, that Campana had reasonable suspicion to believe that criminal activity was afoot in Wright's residence when he conducted the search at issue here.

**IV.    CONCLUSION.**

The better practice under most circumstances is to refrain from ordering a search until a telephone informant's identity could be more conclusively established and/or the information provided corroborated.  Indeed, under the heightened scrutiny of the probable cause standard, it is likely the Court would have required those efforts and suppressed the evidence found here in their absence.  Here, however, the Court is cognizant that "reasonable suspicion can arise from evidence that is less reliable than what might be required to show probable cause."  Weaver v. Shadoan, 340 F.3d 398, 407 (6th Cir. 2003).  Accordingly, for the reasons discussed above, Wright's *Motion to Suppress* (Doc. 29) is **DENIED.**

13

**IT IS SO ORDERED.**

<u>s/Kathleen M. O'Malley</u>
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 5, 2007**